**In re CITY OF BRIDGEPORT, Debtor.**

**Bankruptcy No. 91–51519.**

United States Bankruptcy Court,
D. Connecticut.

July 22, 1991.

See also 128 B.R. 589 and 128 B.R. 686.

Barbara Brazzel–Massaro, City Atty., Office of City Atty., Richard D. Zeisler, James Berman, Barbara L. Hankin, Roy W. Moss, Zeisler & Zeisler, P.C., Bridgeport, Conn., for City of Bridgeport.

Richard Blumenthal, Atty. Gen., Joan E. Pilver, Asst. Atty. Gen., Hartford, Conn., for State of Conn. and Bridgeport Financial Review Bd.

William S. Fish, Tyler, Cooper & Alcorn, Hartford, Conn., for amicus curiae Conn. Conference of Municipalities.

Harry B. Elliott, Jr., J. William Gagne, Jr., Gagne & Collins, Hartford, Conn., for amicus curiae Intern. Ass'n of Firefighters, Local 834, and American Fed. of State, County, and Mun. Employees, Council 4.

## MEMORANDUM AND ORDER ON THE OBJECTION OF THE STATE OF CONNECTICUT TO CHAPTER 9 PETITION

ALAN H.W. SHIFF, Bankruptcy Judge.

## BACKGROUND

On June 6, 1991, the City of Bridgeport, Connecticut, filed a petition under chapter 9 of the Bankruptcy Code. On June 12 the State of Connecticut and the Bridgeport Financial Review Board[1] (together "the State") filed an objection to the petition, *see* 11 U.S.C. § 921(c),[2] asserting, *inter alia,*[3] that Bridgeport was not authorized to be a

debtor by state law, *see* 11 U.S.C. § 109(c)(2),[4] and that the petition should be dismissed. The narrow issue addressed here is whether Bridgeport had such authority.

### 1.

In our democracy, people look to and are served by their elected representatives in national, state, and local government, but our federal system only recognizes the dual sovereignty of the United States and the states. The separation between the powers of the nation and those of the states has been well delineated by the Supreme Court and is not at issue here. *See National League of Cities v. Usery,* 426 U.S. 833, 842–52, 96 S.Ct. 2465, 2470–74, 49 L.Ed.2d 245 (1976) ("[I]nsofar as the challenged amendments operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Art. 1, § 8, cl. 3."); *Fry v. United States,* 421 U.S. 542, 547 n. 7, 95 S.Ct. 1792, 1795 n. 2, 44

---

1. The Bridgeport Financial Review Board was established by the State in June, 1988, pursuant to Special Act No. 88–80. Section 1 of that Act provides:

> It is hereby found and declared that a financial emergency exists in the town and city of Bridgeport, that the continued existence of this financial emergency is detrimental to the general welfare of the city and the state, that the town and city's continued ability to borrow in the public credit markets and the resolution of this financial emergency is a matter of paramount public interest and that to achieve this resolution it is necessary, appropriate and an essential public purpose to provide in this act for the financing of deficits resulting from the city's operations, the imposition of financial management controls and the creation of the Bridgeport financial review board to review the financial affairs of the town and city of Bridgeport, all in order to maintain access to public credit markets, to fund the city's accumulated deficits and to restore financial stability to the town and city of Bridgeport.

2. Bankruptcy Code § 921(c) provides:

> After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title.

3. The State also objects on the grounds that Bridgeport is not insolvent, that the petition was

filed in bad faith, and that the mayor was not properly authorized by the Common Council to file the petition.

4. Code § 109(c) provides:

> An entity may be a debtor under chapter 9 of this title if and only if such entity—
>
> (1) is a municipality;
>
> (2) is generally authorized to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
>
> (3) is insolvent;
>
> (4) desires to effect a plan to adjust such debts; and
>
> (5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
> (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
>
> (C) is unable to negotiate with creditors because such negotiation is impracticable; or
>
> (D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

L.Ed.2d 363 (1975) ("The [Tenth] Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system."). What is questioned is the extent of the delegation of the State's powers to its cities in general and to Bridgeport in particular.

■ It is beyond peradventure that municipalities are political subdivisions of states from which they derive all of their rights and powers. Chapter 9 does not disturb that arrangement, that is, it does not give a city rights and powers independent of the state. Thus, chapter 9 does not give a city the power to file a bankruptcy petition. Rather, it is the state which must decide whether to empower its cities to file. As the Supreme Court stated in *United States v. Bekins*, 304 U.S. 27, 54, 58 S.Ct. 811, 816–17, 82 L.Ed. 1137 (1938), bankruptcy law is designed so that a state *may* allow "the intervention of the bankruptcy power to save its agency [the city] which the State itself is powerless to rescue. Through [the State's] cooperation with the national government the needed relief is given." [5] The legislative history of chapter 9 notes that care was taken to recognize state sovereignty: "[T]his bill takes ... care to insure that there is no interference in the political or governmental functions ... of the State in its power to control its municipalities." H.R.Rep. No. 595, 95th Cong., 1st Sess 262–264 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6221. Section 903 expressly provides that "[t]his chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in

the exercise of the political or governmental powers of such municipality...."

### 2.

Bridgeport, with a population of approximately 140,000, is Connecticut's largest city. The petition states that Bridgeport is the third poorest city in Connecticut based on per capita median income; that it has major health and public safety problems; that it has the highest effective tax rate in Connecticut; and that it is facing a significant budget deficit this year which will increase to $55,000,000.00 in 1992–1993 and $250,000,000.00 within five years. The petition further states that to eliminate this year's budget deficit, Bridgeport would have to raise taxes by up to 18% and/or reduce police and fire protection; street cleaning and snow and garbage removal; and park, recreation, and library services. The petition also alleges that Bridgeport's current budget deficit was caused by, *inter alia*, the increase in unfunded state and federal mandates for services, the decrease in state and federal revenue sharing,[6] the refusal of surrounding suburban areas to share in the expense for social services provided by Bridgeport to persons throughout the metropolitan region, and excessive labor contracts.

The State argues that Bridgeport is not an eligible chapter 9 debtor because:

(1) there is no express or implied authority under state law empowering Bridgeport to be a debtor;[7]

(2) a city is not generally authorized to be a debtor under chapter 9 unless the state permits the city to control its own operation and financial affairs, including its ability to incur debt, and the state deprived

---

**5.** Article I, § 8, cl. 4 of the United States Constitution provides that "Congress shall have the Power ... To establish ... uniform Laws on the subject of Bankruptcies throughout the United States...." *See Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188, 22 S.Ct. 857, 860, 46 L.Ed. 1113 (1902) ("[Congress' power under the Bankruptcy Clause] includes the power to discharge the debtor from his contracts and legal liabilities, as well as to distribute his property. The grant to Congress involves the power to impair the obligations of contracts, and this the States were forbidden to do.").

**6.** Exhibit A of the Connecticut Conference of Municipalities Supplemental Memorandum of Law states that unrestricted State aid to Bridgeport has dropped from $14,058,712 in 1987–88 to $13,445,987 in 1988–89, $13,180,706 in 1989–90, $12,964,813 in 1990–91, and a projected $7,450,310 in 1991–92.

**7.** *See* 11 U.S.C. § 109(c)(2), *supra* note 4.

Bridgeport of such control when it enacted Special Act 88–80, as amended[8] (Special Act No. 88–80 and its amendments are hereafter referred to as "the Special Act"), and created the Financial Review Board (the "FRB") to exercise control over Bridgeport's budget and financial affairs, *see supra* note 1; and

(3) the FRB has twice voted to disapprove the filing of a petition.

In response, Bridgeport argues that because it has the power under state law to manage and control its affairs, and in particular the authority to institute any proceeding, *see* Conn.Gen.Stat. § 7–148(c)(1)(A), *infra* at 696, it is "generally authorized" by state law to be a debtor. Bridgeport also contends that the powers of the FRB should be construed narrowly, so that its creation by the Special Act did not explicitly or implicitly eliminate that authority. The Connecticut Conference of Municipalities supports Bridgeport's argument that it is generally authorized by state law to be a chapter 9 debtor. The International Association of Firefighters, Local 834, and the American Federation of State, County, and Municipal Employees, Council 4, support the State's position.

The issue of whether Bridgeport is generally authorized by state law to be a debtor under chapter 9 is resolved by an analysis of the following questions:

(1) Was Bridgeport generally authorized to be a debtor under state law prior to the passage of the Special Act?

(2) If the answer to (1) is yes, did the Special Act eliminate that general authority?

(3) If the answer to (2) is yes, did Bridgeport waive or is it estopped from raising any constitutional infirmity in the Special Act?

## DISCUSSION

*Was Bridgeport generally authorized to be a debtor under state law prior to the passage of the Special Act?*

 Code § 109(c)(2), *see supra* note 4, states that general authorization may be granted either by "State law" or by "a governmental ... organization empowered by State law to authorize such entity to be a debtor...." The State argues that the FRB is such a governmental organization and that therefore the former source of authority is displaced by the latter. I disagree. The two sources of general authority are joined by "or". Code § 102(5) provides that " 'or' is not exclusive...." The legislative history of § 102(5) states that "if a party 'may do (a) or (b)', then the party may do either or both. The party is not limited to a mutually exclusive choice between the two alternatives." S.Rep. No. 989, 95th Cong., 2d Sess. 28 (1978), U.S. Code Cong. & Admin.News 1978, p. 5814. *See also In re Broad Assoc. Limited Partnership*, 125 B.R. 707, 711 (Bankr.D.Conn. 1991). Further, in explaining Bankruptcy Act § 84,[9] the predecessor of § 109(c)(2), the Senate stated that "[i]n the absence of general statutory consent, [this subsection] authorizes the chief executive, legislature or any other governmental officer or organizations, so empowered under state law, to authorize the filing of such a petition." S.Rep. No. 458, 94th Cong., 2d Sess. 16 (1975). The lack of authorization from any entity empowered to give it does not affect any general authorization which exists otherwise under state law. Therefore, the issue here is whether Bridgeport was generally authorized pursuant to the "State law" clause of § 109(c)(2).

### 1.

 The State argues that for a city to be generally authorized to be a debtor there must be express authorization in a state statute; *i.e.*, *specific* words in the

---

8. Special Act No. 88–80 was amended by Special Act No. 89–23 (May 24, 1989); Special Act No. 89–47 (June 27, 1989); and Special Act No. 90–31 (June 6, 1990).

9. Bankruptcy Act § 84 provided that a city must be "generally authorized to file a petition under this chapter by the legislature, or by a governmental officer or organization empowered by State law to authorize the filing of a petition...."

nature of "bankruptcy" or "debt adjustment" or "reorganization" must be found in a state statute, and that without such affirmative legislative action § 109(c)(2) would violate the Tenth Amendment of the United States Constitution. The thrust of the State's argument is that "generally authorized" must be read as "specifically authorized".[10] For the reasons that follow, I disagree.

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). Further, it is well settled that courts are generally not authorized to rewrite statutes. *See Badaracco v. Commissioner*, 464 U.S. 386, 398, 104 S.Ct. 756, 764, 78 L.Ed.2d 549 (1984); *TVA v. Hill*, 437 U.S. 153, 194–95, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978). The word "generally" commonly means a "disregard of specific instances," *Webster's Ninth New Collegiate Dictionary* 510 (1983), so that to adopt the State's interpretation would be to rewrite § 109(c)(2) in a way that would give it a meaning contrary to what is plainly expressed.

The history of § 109(c)(2) supports the conclusion that it should not be read to require any type of specific authorization. Section 109(c)(2) was derived from § 84 of the Bankruptcy Act, *see supra* note 9, which was enacted in 1976 and included the "generally authorized" language. H.R. Rep. No. 595, 95th Cong., 1st Sess. 318–19 (1977). That language was the result of a compromise between a House version which would have permitted the filing of a petition if it was "not prohibited" by state law and a Senate version which would have required that the petition be "specifically authorized". H.R.Conf.Rep. No. 938, 94th Cong., 2d Sess. 16–17 (1976), U.S.Code Cong. & Admin.News 1976, p. 539; H.R. 10624, 94th Cong., 1st Sess. (1975); S. 2597, 94th Cong., 1st Sess. (1975). During the Congressional debate on that provision in the current Code, a House proposal that

"not prohibited" language be used in § 109(c)(2) was again rejected by the Senate, and the compromise which eliminated a requirement of specific authorization was carried into the present law.

The meaning of generally authorized is also gleaned from a holistic view of the Code. *See Crandon v. United States*, 494 U.S. 152, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990) ("In determining the meaning of a statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."). It is noted that generations of decisions have established the place of bankruptcy in federal public policy and have held that in general bankruptcy laws are to be liberally construed and ambiguities are to be resolved in favor of the debtor, so that the debtor receives the full measure of relief afforded by Congress. *E.g., Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 278–79, 61 S.Ct. 196, 199–200, 85 L.Ed. 184 (1940); *In re Mahaffey*, 129 F.2d 292, 295 (2d Cir.1942); *New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund*, 886 F.2d 714, 719 (4th Cir.1989); *In re Lange*, 39 B.R. 483, 485 (Bankr.D.Kan.1984).

Only federal law can give the type of relief afforded by chapter 9. As the Supreme Court stated in *United States v. Bekins*, 304 U.S. 27, 53–54, 58 S.Ct. 811, 816, 82 L.Ed. 1137 (1938):

In the instant case we have cooperation to provide a remedy for a serious condition in which the States alone were unable to afford relief. Improvement districts, such as the petitioner, were in distress. Economic disaster had made it impossible for them to meet their obligations. As the owners of property within the boundaries of the district could not pay adequate assessments, the power of taxation was useless.... The natural and reasonable remedy through composition of the debts of the district was not available under state law by reason of the restriction imposed by the Federal Constitution upon the impairment of contracts by state legislation.

---

**10.** *See, e.g., Brief By the State of Connecticut* at 7, 9.

*See also* U.S. Const. Art. I, § 8, cl. 4, *supra* note 5; S.Rep. No. 989, 95th Cong., 2d Sess. 110 (1978), U.S.Code Cong. & Admin. News 1978, p. 5896 ("Deletion of [§ 903] would 'permit all States to enact their own versions of Chapter IX', which would frustrate the constitutional mandate of uniform bankruptcy laws."). The legislative history of the 1976 amendments to chapter IX of the Bankruptcy Act, under which the direct forerunner of § 109(c)(2) was enacted, *see supra* note 9, states:

> While Chapter IX has no doubt performed a valuable function during the period of its existence, in recent years it has become clear that amendment is necessary if it is to provide an adequate vehicle for reorganization of a troubled municipality.... The provisions of the chapter should provide ready access to the bankruptcy courts. It is during the first steps of reorganization that delay could cause the most permanent harm.

S.Rep. No. 458, 94th Cong., 2d Sess. 13 (1976). Thus, it appears that the choice of the "generally authorized" standard was employed by Congress to provide cities with the maximum access to chapter 9 consistent with the Tenth Amendment. *See In re Pleasant View Utility Distr. of Cheatham County*, 24 B.R. 632, 638 (Bankr.M.D. Tenn.1982) ("[A] strict construction of the term 'generally authorized' would be in direct contravention with the Congressional concern that financially distressed municipalities should be able to efficiently and expeditiously reorganize their economic affairs."), *appeal denied*, 27 B.R. 552 (M.D. Tenn.1982).

■ The lack of a specific authorization standard does not raise the constitutional problems cited by the State. In *Ashton v. Cameron County Water Improvement Distr.*, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309 (1936), the Supreme Court held that chapter IX of the Bankruptcy Act was unconstitutional because it materially restricted the states in the control of their fiscal affairs.[11] The Court stated that

[n]either consent nor submission by the States can enlarge the powers of Congress; none can exist except those which are granted. The sovereignty of the State essential to its proper functioning under the Federal Constitution cannot be surrendered; it cannot be taken away by any form of legislation.

*Id.* at 531, 56 S.Ct. at 896 (citations omitted). It follows from *Ashton* that it is not the form of the state law authorizing a city to be a debtor which raises a Tenth Amendment issue. Rather, the question is whether the state has given a city such power at all.

■ It is again emphasized that a municipality is merely a political subdivision of the state from which its authority derives, *United Building & Constr. Trades Council v. Mayor*, 465 U.S. 208, 215, 104 S.Ct. 1020, 1026, 79 L.Ed.2d 249 (1984), and has only those powers expressly or impliedly granted by the state. *E.g., Jackson Firefighters Ass'n v. City of Jackson*, 736 F.2d 209, 212 (5th Cir.1984); *Bambu Sales, Inc. v. Gibson*, 474 F.Supp. 1297, 1300 (D.N.J. 1979). If a state had not expressly or impliedly given a city the power to be a debtor and chapter 9 purported to do so independent of state law, the Tenth Amendment would be implicated. For example, if the Code provided that the city had such power unless there was a specific prohibition in state law, the Code might be granting the city a power it would not otherwise have and that would clearly raise a Tenth Amendment issue, but if the state chooses to give authorization, the degree of specificity it provides is the state's choice and the Tenth Amendment would not be implicated.

The State relies on *In re Carroll Township Authority*, 119 B.R. 61 (Bankr.W.D. Pa.1990), and attacks the validity of cases in which municipalities were found to be generally authorized to be debtors even though there was no specific grant of authority by the state, *see In re Greene*

---

11. In August 1937 Congress passed a new municipal bankruptcy law, chapter X, which, similar to Code §§ 903 and 904, expressly avoided restrictions on the governmental and fiscal powers of states and their subdivisions. Chapter X was found to be constitutional in *United States v. Bekins*, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137 (1938).

County Hospital, 59 B.R. 388, 391 (S.D.Miss.1986); *In re City of Wellston,* 43 B.R. 348, 350 (Bankr.E.D.Mo.1984); *In re Pleasant View Utility District, supra,* 24 B.R. at 636, in support of its argument that Bridgeport had to be specifically authorized. In *Carroll Township,* the court found that a municipal sewage authority which had the power to, *inter alia,* make contracts, acquire property, construct, maintain, and operate facilities, borrow money, assess costs of construction, and do all things necessary to carry out the powers specifically granted, was not authorized to be a debtor. The court focused primarily on a provision granting the sewage authority the power to "sue, be sued, implead, be impleaded, complain and/or defend in all courts," and found that it did not give authorization. However, the court merely found that that provision was not the type of affirmative action which could be construed as general authorization by the state. It did not enunciate any requirement of specific authorization. I also note that the bankruptcy court in *Carroll Township* followed a district court decision in *In re North and South Shenango Joint Municipal Authority,* 80 B.R. 57 (W.D.Pa. 1982), which consisted of an unexplained three paragraph order reversing a bankruptcy court finding that a municipal authority was generally authorized to be a debtor.

The State contends that *City of Wellston, Pleasant View Utility District,* and *Greene County Hospital* relied on the bankruptcy court decision in *North and South Shenango, Matter of North and South Shenango Joint Municipal Authority,* 14 B.R. 414 (Bankr.W.D.Pa.1981), but the *City of Wellston* court did not cite or in any way rely on *North and South Shenango. Pleasant View Utility District* cited *North and South Shenango* at the beginning of an extensive discussion of the meaning of "generally authorized" in a footnote discussing the paucity of case law on the issue and, under any fair reading of *Pleasant View,* it is clear that the court placed no reliance on *North and South Shenango.* Although *Greene County Hospital* did cite *North and South Shenango,*

it also relied upon *City of Wellston* and *Pleasant View Utility District.* I note that the *Carroll Township* court expressly stated that the statutory language found by *City of Wellston* and *Pleasant View Utility District* to generally authorize municipal bankruptcy was not included in the Pennsylvania law which it found inadequate as an expression of such authorization.

■ Consistent with the plain meaning of the statute, its legislative history, the general principal that Code provisions are to be liberally construed, and the Congressional intent that cities have an adequate vehicle for adjusting their affairs, I conclude that the words "generally authorized" should be given a broad construction rather than the narrow interpretation urged by the State. I agree with the State that some affirmative authorization is required. I disagree that the authorization must specifically refer to bankruptcy, debt adjustment, insolvency, or any variation thereof, and I conclude that Bridgeport was generally authorized to be a debtor if state law delegated to it home rule authority over such matters as finances, property, borrowing, and public services and the corresponding rights and powers necessary to achieve the purpose of such home rule. *In re Greene County Hospital, supra,* 59 B.R. at 390–91; *In re City of Wellston, supra,* 43 B.R. at 350; *In re Pleasant View Utility Distr., supra,* 24 B.R. at 638–39.

2.

The question evolves, has Connecticut delegated to its cities home rule authority as to which the right to be a debtor is an appropriate part. For the reasons that follow, I conclude that it has.

■ Connecticut General Statutes § 7–148(c)(1)(A) provides that a "municipality shall have the power to ... sue and be sued, *and* institute, prosecute, maintain and defend any action or proceeding in any court of competent jurisdiction...." (Emphasis added). The State argues that a bankruptcy proceeding is not like other

proceedings and that instituting a bankruptcy proceeding should not be included in § 7–148(c)(1)(A). The thrust of the State's position is that the only type of proceeding contemplated by § 7–148(c)(1)(A) is a plaintiff vs. defendant adversarial action. I disagree. If the words "institute any proceeding" were read to mean only "institute adversary proceedings", *i.e.*, "sue and be sued", they would be superfluous and that could not have been intended. *Harris Data Communications, Inc. v. Heffernan,* 183 Conn. 194, 197, 438 A.2d 1178 (1981); *Green v. Freedom of Information Comm'n,* 178 Conn. 700, 703, 425 A.2d 122 (1979). It follows then that "institute any proceeding" must be interpreted to mean something more than institute an adversarial action.

■ Words which are not defined are given their ordinary, plain meaning. As the Supreme Court stated in *Hale v. Henkel,* 201 U.S. 43, 66, 26 S.Ct. 370, 375, 50 L.Ed. 652 (1906), "[t]he word 'proceeding' is not a technical one." "Proceeding" is generally defined as "the form and manner of conducting juridical business before a court or juridical officer.... [A] prescribed mode of action for carrying into effect a legal right." *Black's Law Dictionary* 1368 (Fourth ed. 1951). In *State v. Ventola,* 122 Conn. 635, 639, 191 A. 726 (1937), the Connecticut Supreme Court stated that " '[t]he term "proceeding," as ordinarily used, is generic in meaning and broad enough to include all methods involving the actions of courts....' " (Quoting *Carleton v. District Court,* 33 Mont. 138, 142, 82 P. 789 (1905)). The lower court in *Ventola* stated that "[t]he word 'proceeding' is as broad a word as may be used. An examination of the derivation of the word indicates that it is anything that moves forward; and so this word has been applied to business and affairs of many kinds." *State v. Ventola,* 4 Conn.Sup. 161, 162 (1936). It is therefore apparent that "proceeding" is broadly construed by Connecticut courts. *See United States v. Anaconda Am. Brass Co.,* 210 F.Supp. 873, 876 (D.Conn.1962).

■ Rather than list every type of proceeding, the State chose through § 7–148(c)(1)(A) to give cities broad authority to institute *any* proceeding. Bankruptcy was not and is not excepted from that statute, and it is the duty of this court to read the statute as it was written. Accordingly, I conclude that bankruptcy is a proceeding within the broad scope of § 7–148(c)(1)(A).[12]

■ It is also beyond question that this court is a "court of competent jurisdiction." Title 28 U.S.C. § 1334(a) provides that "the district courts shall have original and exclusive jurisdiction of all cases under title 11." Title 28 U.S.C. § 157(a) provides:

Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

On September 21, 1984, the District Court for the District of Connecticut entered an order that:

[A]ll proceedings arising under title 11, U.S.C., or arising in or related to a case under title 11, U.S.C., pending on June 27, 1984, or filed on or after June 28, 1984, are referred to the Bankruptcy Judges for this District....

Title 28 U.S.C. § 157(b)(1) provides:

Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, re-

**12.** The State contends that "[t]o argue ... that the general power to 'sue and be sued' under Conn.Gen.Stat. § 7–148(c)(1) is a sufficient affirmative showing of state intent, makes a mockery of the State legislative sovereignty that Congress intended to preserve. Virtually every municipality in this country had long had such powers under state law when the Bankruptcy Code was enacted." However, the Senate Report on the 1976 revision of the Act which enacted Bankruptcy Act § 84, *see supra* note 4, stated that "[a] general statutory provision which may have been enacted prior to this chapter is thought by the Committee to meet the requirement of specific consent." S.Rep. No. 458, 94th Cong., 2d Sess. 16 (1975). Thus, the fact that many cities may have the type of power granted by § 7–148(c)(1)(A) is not relevant to the determination of whether that statute grants the required general authority.

ferred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

As this is a court of competent jurisdiction and a bankruptcy case is a proceeding, I conclude Bridgeport is generally authorized to be a debtor under § 7–148(c)(1)(A).

 That result would not change even if § 7–148(c)(1)(A) did not give such authorization. To enable Connecticut cities to provide for the public safety, health, and general welfare of its residents and business community, Connecticut General Statutes § 7–194 provides:

> [A]ll towns, cities or boroughs which have a charter or which adopt or amend a charter under the provisions of this chapter shall have the following specific powers in addition to all powers granted to towns, cities and boroughs under the constitution and general statutes: To manage, regulate and control the finances and property, real and personal, of the town, city or borough and to regulate and provide for the sale, conveyance, transfer and release of town, city or borough property and to provide for the execution of contracts and evidences of indebtedness issued by the town, city or borough.

Further, Connecticut General Statutes § 7–148(c) empowers cities to, *inter alia*, make contracts, institute actions and proceedings, establish and maintain a budget, assess and collect taxes, borrow, purchase property, provide for public services such as fire and police, and construct public works such as highways and sewers. The policy underlying this home rule legislation "is that issues of local concern are most logically answered locally...." *Caulfield v. Noble*, 178 Conn. 81, 86, 420 A.2d 1160

(1979). As the Connecticut Supreme Court stated in *City of Norwich v. Housing Auth. of Town of Norwich*, 216 Conn. 112, 579 A.2d 50, 54 (1990), "if ever a statutory plan cried out for an expansive construction favoring local municipal authority over its own affairs, it is the Home Rule Act." *See also Caulfield, supra*, 178 Conn. at 87, 420 A.2d 1160 (1979) ("In the numerous jurisdictions having either constitutional or legislative municipal home rule, the overwhelming view accords to the municipality the fullest extent of home rule authority, consistent with law, in matters of local concern.").[13] Connecticut's courts have held that since the State has given its cities home rule authority, they must also have the corresponding powers necessary to carry out the duties and purposes of that home rule. *City of Norwich v. Housing Authority of Town of Norwich*, 216 Conn. 112, 579 A.2d 50, 56 (1990); *Hennessey v. City of Bridgeport*, 213 Conn. 656, 569 A.2d 1122 (1990) ("[T]he power to lay off municipal employees when a city's financial condition so warrants is necessarily implied from the city's authority over its finances."); *Perretta v. New Britain*, 185 Conn. 88, 102, 440 A.2d 823 (1981) ("In the absence of an express provision, the authority necessary for effective exercise of a granted municipal power will be conferred by implication.")[14]; *City Council of West Haven v. Hall*, 180 Conn. 243, 248, 429 A.2d 481 (1980).

The State has delegated to Bridgeport the duty to provide its residents with a wide variety of necessary services, but obviously Bridgeport can only provide those services if it can pay for them. Chapter 9 provides a method for the adjustment of claims against municipalities so they may reorganize their financial affairs and continue to provide those essential services. I

---

**13.** *But see Simons v. Canty*, 195 Conn. 524, 530, 488 A.2d 1267 (1985) ("Delegation of authority to municipalities is ... narrowly construed.").

**14.** The *Perretta* court held that

> [w]hen the city determines that its welfare and the proper management of its financial resources require reduced expenditures, it has discretion to husband those resources by laying off city employees whose performance it judges expendable. A city may dismiss em-

ployees in such circumstances *even in the face of civil service regulations, charter provisions or statutes requiring just cause for dismissals.* In the absence of any charter provision limiting the mayor's authority to lay off city employees, that authority will be implied as necessary to the execution of his public duties as [the city's] chief executive officer.

*Id.* (emphasis added; citations omitted).

therefore conclude that implied in the delegation of power to manage, regulate, and control finances and to preserve public safety and general welfare is the general authority to seek the protection of the Bankruptcy Code.

### Did the Special Act eliminate Bridgeport's general authority to be a debtor under chapter 9?

The effect of the Special Act on Bridgeport's general authority to file a petition under chapter 9 raises two issues: (1) Did the Special Act eliminate Bridgeport's general authority to file a chapter 9 petition, and (2) did the Special Act empower the FRB to prohibit Bridgeport from filing such a petition?

#### 1.

The State argues that incidental to the bonding purpose of the Special Act is the power of the FRB to encroach upon Bridgeport's home rule authority to control its budget and other affairs and that that power eliminates Bridgeport's authority to be a chapter 9 debtor.

The Special Act does not expressly prohibit Bridgeport from being a debtor. If such a prohibition exists, it must be found by implication, and the State urges a broad construction to achieve that result. Indeed, the State contends that the Special Act gave the FRB vast powers and removed all critical decision making authority over Bridgeport's finances. I conclude, however, that the Special Act must be more narrowly construed.

▮▮▮ As the Connecticut Supreme Court stated in *Caulfield, supra,* 178 Conn. at 87, 420 A.2d 1160,

> home rule legislation was enacted "to enable municipalities to conduct their own business and control their own affairs to the fullest possible extent in their own way ... upon the principle that the municipality itself knew better what it wanted and needed than did the state at large, and to give that municipality

the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs."

(Quoting *Fragley v. Phelan,* 126 Cal. 383, 387, 58 P. 923 (1899)). Article tenth, § 1 of the Connecticut Constitution "prohibits the legislature from encroaching on the local authority to regulate matters of purely local concern, such as the organization of local government or local budgetary policy." *Shelton v. Commissioner,* 193 Conn. 506, 521, 479 A.2d 208 (1984). Since legislation must be read, if possible, to avoid a clash with constitutional provisions, the Special Act must be interpreted in a way that not only recognizes Connecticut's home rule policy, but also its constitutional restriction against special legislation.[15] The conclusion that the Connecticut legislature intended that narrow scope is supported by the Special Act's legislative history. At the Committee on Finance, Revenue and Bonding hearing on the Special Act, State Senator DiBella, the committee's co-chairman, stated:

> [W]hat you have before you ... is a financial model. And I think that this board [the FRB] ... would be primarily for the purpose of oversight, to insure that the municipality maintains a consistency with ... this good financial model, [and] will require that they meet certain criteria and certain standards. *I don't think its the fact that this group will be running the City of Bridgeport.* God forbid that.

*Hearings on Substitute for House Bill 6132 Before the Committee on Finance, Revenue and Bonding,* at 7 (March 28, 1988) (emphasis added).

As with § 7–148(c)(1)(A), the Special Act must be construed to serve its intended purpose. The ultimate objective of the Special Act, which is entitled "An Act Authorizing the Issue of Bonds by the Town and City of Bridgeport", was to enhance Bridgeport's ability to sell its bonds. *See*

---

**15.** *See Engle v. Personnel Appeal Board,* 175 Conn. 127, 134, 394 A.2d 731 (1978) ("[W]here a statute permits two constructions, one valid and the other invalid as unconstitutional, the valid construction should be adopted, even where it is not the obvious one.").

*supra* note 1.[16]

■■■ The State argument that three specific parts of the Special Act support its position is unpersuasive.[17] First, the State points to the restrictions in §§ 17 and 18 on Bridgeport's ability to enter into contracts and argues that because under certain conditions the FRB has the power to approve or disapprove contracts Bridgeport seeks to enter into, Bridgeport's power to reject contracts under § 365 of the Code belongs to the FRB.[18] However, the power of the FRB to prohibit Bridgeport from entering into *new* contracts does not effect Bridgeport's ability to take action with respect to *existing* contracts. Moreover, these restrictions only apply to certain types of future contracts. Section 2(9) of the Special Act defines "contract" as "any agreement, contract, lease, obligation, other than a debt obligation, letter of intent or acceptance regarding the provision of goods or services to or for the benefit of the city by and between the city and any other party, *excluding collective bargaining agreements with employees of the city....*"[19] Thus, the Special Act has no effect on any rights Bridgeport might have to reject contracts under Code §§ 365 and 901.

The second restriction cited by the State is § 3, which directed Bridgeport to issue bonds for the purpose of funding budget deficits and forbids it from borrowing without the approval of the FRB. However, the power of the FRB to control Bridgeport's borrowing, a right Bridgeport might wish to use under chapter 9, *see* 11 U.S.C. §§ 901, 364(c), (d), would not eliminate Bridgeport's right to utilize the rest of chapter 9. Moreover, as with §§ 17 and 18, this provision is prospective; it does not affect obligations incurred by Bridgeport prior to its passage.

■■■ The third area of restrictions cited by the State is in §§ 10 and 11. Section 10 created the FRB and gave it the function of consulting with Bridgeport in the preparation of a financial plan and budget, approving the financial plan, approving the terms of all borrowing, monitoring and recommending improvements in the operations of Bridgeport, and auditing compliance with the financial plan. Under § 11(a), Bridgeport is required to develop a three year financial plan providing for the:

(1) Elimination of all deficits in the general fund; (2) restoration to all funds and accounts, including capital funds and accounts, of any moneys from such funds and accounts that were used for purposes not within the purposes of such funds and accounts or borrowed from such funds or accounts; (3) balancing of the operating funds in accordance with the provisions of this act; (4) maintenance of current payments of all accounts; (5) estimation of the amount of bonds or notes to be issued by the city and debt service requirements; and (6) assumptions on which revenue and expenditure projections are based.

Section 11(b)(1) requires the mayor to submit Bridgeport's proposed annual budget for the ensuing fiscal year and a financial plan for the two fiscal years following the ensuing fiscal year. Section 11(b)(2) re-

---

**16.** The State concedes that the primary purpose of the Special Act was to protect the City's borrowing power. *See Brief By the State of Connecticut* at 13.

**17.** In the chambers conference which followed the June 26 hearing on this matter, the parties were directed to explicitly cite any provision of the Special Act they were relying on. As the State cites only §§ 3, 10, 17 and 18, it is assumed that the State does not rely on any other part of the Special Act.

**18.** Code § 365(a), made applicable by § 901, provides:

Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

**19.** The exclusion of collective bargaining agreements from the coverage of the Act apparently made the contract restrictions inapplicable to the great majority of Bridgeport's contracts in terms of dollar amounts. *See Hearings On Substitute for House Bill 6132 Before the Committee on Finance, Revenue and Bonding,* 46–47 (March 28, 1988) ("Rep. Nickerson: '[Collective bargaining agreements with employees of the City] are about 75% of your budget, is that a correct number?' Mayor Thomas Bucci: 'Yes.' ").

quires the FRB to determine whether the proposed annual budget and the financial plan conform to the requirements of the Special Act not later than thirty days after their submission by Bridgeport. Section 11(b)(5) provides that the FRB shall disapprove the financial plan or annual budget if it:

(A) Is incomplete; (B) fails to contain projections of revenues and expenditures that are based on reasonable and appropriate assumptions and methods of estimation; (C) fails to provide that operations of the city will be conducted within the cash resources available according to the board's revenue estimates; or (D) fails to comply with the provisions of this section.

The State argues that since those provisions gave the FRB the right to determine whether Bridgeport's budget is feasible, Bridgeport cannot have a plan of reorganization confirmed without the approval of the FRB. 11 U.S.C. § 943(b)(7).[20] I disagree. A plan and a budget are conceptually different. A chapter 9 plan would presumably attempt to adjust certain executory contracts and provide for the adjustment of prepetition debts. Bridgeport's next budgets, on the other hand, will deal with future revenues and expenditures. *See Voluntary Petition, The City's Intentions* ("The City's primary purpose in filing the annexed Petition is to utilize the provisions of the Bankruptcy Code to adjust its debts, and specifically to modify certain onerous and economically burdensome contracts.")

In the final analysis the Special Act, written within the strictures of Article tenth, § 1 of the Connecticut Constitution and Connecticut's policy of favoring home rule, is no more and can be no more than a bonding statute. As such, the Special Act neither effects Bridgeport's authority to conduct day to day operations nor its right to institute proceedings, including bankruptcy. Accordingly, I conclude that the Special Act did not eliminate Bridgeport's general authority to file a bankruptcy petition.

2.

The FRB passed two resolutions regarding the filing of a petition by Bridgeport. The first, passed on January 10, 1991, stated that the FRB would not approve any petition filed by Bridgeport. The second, passed on June 7, 1991, the day after the petition was filed, directed the mayor of Bridgeport to withdraw the petition and, if the mayor failed to do so, directed the Attorney General to seek dismissal of the petition. The State argues that the FRB was granted vast powers over the operations of Bridgeport, and that implicit in those powers was the authority to approve or prohibit the filing of a petition. I disagree.

Statutes granting power to administrative agencies are strictly construed to permit only those powers given expressly or by necessary implication. *Walker v. Luther,* 830 F.2d 1208, 1211 (2d Cir.1987). An agency such as the FRB cannot change the statute which grants it powers unless the statute expressly so provides. *Castro v. Viera,* 207 Conn. 420, 428, 541 A.2d 1216 (1988); *Lundy Electronics and Sys., Inc. v. Tax Commissioner,* 189 Conn. 690, 694–95, 458 A.2d 387 (1983). It follows then that any action taken by an administrative agency in excess of its statutory authority is void and without legal effect. *Young v. Chase,* 18 Conn.App. 85, 557 A.2d 134, 138 (1989), *cert. denied,* 211 Conn. 807, 559 A.2d 1141 (1989); *Breen v. Department of Liquor Control,* 2 Conn.App. 628, 481 A.2d 755, 760 (1984), *cert. granted,* 194 Conn. 808, 483 A.2d 1098 (1984), *opinion after remand,* 5 Conn.App. 432, 499 A.2d 432 (1985).

The Special Act granted the FRB certain functions and powers, including the following which are material to this discussion:

(1) Consult with Bridgeport in the preparation of a financial plan and budget, approve or disapprove the financial plan, and

---

**20.** Code § 943(b) provides:
The court shall confirm a plan if—
. . . .

(7) the plan is in the best interests of creditors and is feasible.

adopt a financial plan if Bridgeport fails to submit one which is approved. §§ 10(1)(A), 11(b).

(2) Review and approve or disapprove the terms of proposed borrowing by Bridgeport. § 10(1)(C).

(3) Review, make reports on, and recommend improvements in the efficiency of Bridgeport operations and management, and audit compliance with the financial plan. § 10(2). The last clause of § 10(2) specifically provides that "[n]othing herein shall diminish the powers of the mayor, the comptroller, the common council or any other board, agency or authority of the city otherwise provided by law."

(4) Formulate and adopt modifications to the financial plan and budget and approve or disapprove all contracts based on compliance with the financial plan and budget if Bridgeport had an operating fund balance deficit, i.e. an excess of expenditures to cash revenues in the general fund, or lost access to the public credit markets. § 18(1)–(3).

(5) Issue such orders as it deemed necessary to accomplish the purposes of the Special Act. § 18(4).

The State's reliance on § 18(4) as an express grant of power to the FRB to prohibit bankruptcy is unpersuasive. That subsection, which granted the FRB the authority to "issue to the appropriate officials of the city such orders as it deems necessary to accomplish the purposes of [the Special Act], including but not limited to, timely and satisfactory implementation of an approved financial plan and annual budget ...," must be read with the statute as a whole. An unqualified effect cannot be given to a single section, even if its language is unambiguous when considered by itself, if such an unqualified interpretation would create a conflict with other provisions of the statute. *State v. Gonzalez*, 210 Conn. 446, 556 A.2d 137, 139 (1989); *Hope v. Cavallo*, 163 Conn. 576, 316 A.2d 407 (1972); *Brown ex rel. Gray v. Quintilian*, 121 Conn. 300, 184 A. 382 (1936). Further, as the Connecticut Supreme Court held in *State v. White*, 204 Conn. 410, 419, 528 A.2d 811 (1987),

[i]t is necessary ... that the enabling statute declare legislative policy, establish primary standards or lay down an intelligible principle to which the administrative officer or body must conform. If the legislature fails to prescribe the limits of the power delegated with reasonable clarity, or the power is too broad, its attempt to delegate is a nullity.

(Citations omitted).

The State would have § 18(4) read as an unbridled right of the FRB to issue *any* order, but the Special Act includes very specific provisions delimiting the powers of the FRB and its relationship to Bridgeport. If § 18(4) were read to allow the FRB to issue *any* order, those carefully crafted provisions would be nullified. For example, § 10(2), which specifically provides that nothing in § 10 diminishes the powers of Bridgeport otherwise provided by law, would be rendered meaningless under the State's view of § 18(4). Further, following the State's logic, if the FRB determined that the actions of a city official were harming Bridgeport's bond rating, it could simply order the replacement of that official, something clearly not contemplated by the Special Act. Thus, I read § 18(4) as authorizing the FRB to issue only those orders which aid it in carrying out its specific functions and duties. Orders prohibiting bankruptcy were beyond FRB's powers and any such prohibition is void and without effect.

The power to prohibit a bankruptcy was not given expressly to the FRB, nor was it given by necessary implication. As noted, there is no reason to believe that a bankruptcy case is inconsistent with the purposes of the Special Act, i.e., the restoration of financial stability through enhanced access to public credit markets. Indeed, the restoration of the financial stability of a troubled city is precisely what Congress designed chapter 9 to accomplish. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 262–64 (1977), U.S.Code Cong. & Admin. News 1978, p. 6221 ("Chapter 9 provides a workable procedure so that a municipality of any size that has encountered financial

difficulty may work with its creditors to adjust its debts."). Therefore, the power to prevent a bankruptcy proceeding is not necessarily implied from the FRB's purposes or powers.

## CONCLUSION

Bridgeport was generally authorized by state law to be a debtor prior to the passage of the Special Act; the Special Act did not eliminate that authority; and the Special Act did not empower the FRB to prohibit Bridgeport from filing a petition. Accordingly, the State's Objection under § 109(c)(2), that Bridgeport was not "generally authorized to be a debtor" under chapter 9, is OVERRULED, AND IT IS SO ORDERED.[21]

21. Because I conclude that the Special Act did not eliminate Bridgeport's general authorization to be a debtor, I need not address the waiver/estoppel question.