**In re CITY OF BRIDGEPORT, Debtor.**

**Bankruptcy No. 91–51519.**

United States Bankruptcy Court,
D. Connecticut.

Sept. 16, 1991.

Barbara Brazzel-Massaro, City Atty., Robert G. Zanesky, Associate City Atty., Office of the City Atty. and Richard D. Zeisler, Zeisler & Zeisler, P.C., Bridgeport, Conn., for City of Bridgeport.

Richard Blumenthal, Atty. Gen., Joan E. Pilver, Asst. Atty. Gen., and David G. Hetzel, Hebb & Gitlin, Hartford, Conn., for State of Conn. and the Bridgeport Financial Review Bd.

MEMORANDUM AND ORDER ON MOTION FOR STAY PENDING APPEAL UNDER BANKRUPTCY RULE 8005

ALAN H.W. SHIFF, Bankruptcy Judge.

I.

On June 6, 1991, the City of Bridgeport, Connecticut filed a petition under chapter 9 of the Bankruptcy Code. On June 7, the Bridgeport Financial Review Board ("the FRB")[1] passed a resolution adopting an

---

1. The Bridgeport Financial Review Board was established by the state in June, 1988, pursuant to Special Act No. 88–80, "to review the financial affairs of the town and city of Bridgeport ... in order to maintain access to the public credit markets, to fund the city's accumulated deficits and to restore financial stability to the town and city of Bridgeport." Special Act No.

88–80, § 1, as amended by Special Act No. 89–23 (May 24, 1989); Special Act No. 89–47 (June 27, 1989); Special Act No. 90–31 (June 6, 1990). Special Act No. 88–80 and its amendments are hereafter referred to as "the Special Act". *See In re City of Bridgeport,* 128 B.R. 688 (Bankr. D.Conn.1991), for a more detailed discussion of the powers and duties of the FRB.

interim budget for Bridgeport.[2] That resolution specified that a mill rate of 71.2 was required to balance the interim budget. *Bridgeport Ex.* 1. On June 10, the Bridgeport Common Council adopted a mill rate of 63.3, which would yield a budget deficit of approximately $16,000,000.00 in fiscal year 1991–1992.

On June 12, the State of Connecticut and the FRB (together "the State") filed an objection to the petition, *see* 11 U.S.C. § 921(c), asserting that Bridgeport was not generally authorized to be a debtor under chapter 9 by state law, that Bridgeport was not insolvent when it filed its petition, and that the petition was filed in bad faith.[3] On June 13, the FRB passed a resolution ordering the Common Council to adopt a tax rate of 71.2 mills. On June 21, the State filed an amended objection, asserting that the mayor of Bridgeport was not properly authorized by the Common Council to file the petition. On July 11, the FRB passed a resolution ordering Bridgeport

> to comply with the Board's June 13, 1991 order or to take actions necessary to increase revenues and/or reduce expenditures for FY 1991–92 ...; ... [and] to submit to the Board by July 29, 1991 a modified budget for the City General Fund, Capital Fund and Special Revenue Funds, for FY 1991–92 to supersede the Board adopted interim budget, such modified budget to be in conformance with the Act....

*Bridgeport Ex.* 4, at A–12. That resolution also provided that the Chairman of the FRB "is hereby authorized to take such other and further action on behalf of this Board, within his discretion, as may be appropriate in the circumstances...." *Id.*

On July 22, an order entered holding that "Bridgeport was generally authorized by state law to be a debtor prior to the passage of the Special Act; the Special Act did not eliminate that authority; and the Special Act did not empower the FRB to prohibit Bridgeport from filing a petition." *In re City of Bridgeport,* 128 B.R. 688, 703 (Bankr.D.Conn.1991). Accordingly, I overruled the State's objection under Code § 109(c)(2). *See supra* note 3. Familiarity with that order is assumed.

On August 1, an order entered ("the August 1 Order") holding that to be found insolvent under § 101(32)(C), a municipality must prove that it will be unable to pay its debts as they become due in its current fiscal year or, *"based on an adopted budget, in its next fiscal year." In re City of Bridgeport,* 129 B.R. 332, 21 BCD 1546, 1549 (Bankr.D.Conn.1991). The emphasized quoted language was added to the definition to limit the time frame of the analysis, so that a determination of insolvency is not based upon a projection of what revenue and expenses might be included in unadopted budgets. If a budget has not been adopted, the cash flow analysis of insolvency would be left to gross speculation. Based on that standard, I found that Bridgeport was not insolvent because although it had a projected fiscal year 1991–1992 budget deficit of $16,000,-000.00, it started the fiscal year with $27,-

---

**2.** Section 12(a) of the Special Act mandates that Bridgeport have a balanced budget. The budget adopted by the Bridgeport Common Council in May, 1991 for the 1991–1992 fiscal year had a projected deficit of $16,000,000.00. Section 11(b)(6) of the Special Act provides in part:

> In the event that the city shall, for any reason, fail to submit ... [an] annual budget as required by this section ... the board, after enactment of a resolution so finding, shall formulate and adopt ... [an] annual budget ... to be effective until the board approves ... [an] annual budget ... submitted by the city.

**3.** Bankruptcy Code § 921(c) provides:

> After any objection to the petition, the court, after notice and a hearing, may dismiss

the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title.

Code § 109(c) provides:

> An entity may be a debtor under chapter 9 of this title if and only if such entity—
>
> ....
>
> (2) is generally authorized to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
>
> (3) is insolvent; [and]
>
> (4) desires to effect a plan to adjust such debts....

908,513.00 (the "Bond Fund"),[4] and it intended to and would be able to use that cash to fund its fiscal year 1991–1992 deficit. *See id.* BCD at 1548–49. Accordingly, I sustained the State's objection and dismissed Bridgeport's petition.

On August 7, Bridgeport was granted an extension of time to file an appeal of the August 1 order until September 3, 1991. By a letter dated August 19, Bridgeport informed the State that it intended to use the Bond Fund to balance its fiscal year 1991–1992 budget. *Bridgeport Ex.* 3. On August 23, Bridgeport filed the instant Motion for Continuation of Stay of Enforcement of Claims Without Supersedeas Bond. By a letter dated August 29 to Bridgeport Mayor Mary Moran, William Cibes, the FRB chairman, stated that Bridgeport could not use the Bond Fund to balance its budget. *Bridgeport Ex.* 2. On August 30, the State filed an objection to the instant motion. On September 3, Bridgeport filed a notice of appeal.

In support of its motion, Bridgeport argues it will be irreparably harmed because, if a stay is not granted, the State will attempt to compel the City to balance its fiscal year 1991–1992 budget and prohibit its use of the Bond Fund to pay operating expenses as they become due. Bridgeport also argues that if a stay is not granted, onerous municipal employee contracts may be awarded by binding arbitration.

## II.

Bankruptcy Rule 8005 provides in part:

A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance. Notwithstanding Rule 7062 but subject to the power of the district court ... reserved herein, the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code

4. The Bond Fund was raised as part of a $58,-315,000.00 bond sale in January, 1989.

5. I note that an irreparable harm standard is also included in the criteria for a preliminary

or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest.

■ Four factors are considered in determining whether a stay pending appeal is warranted: (1) whether the stay applicant has shown a substantial possibility of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of a stay will substantially injure the other parties interested in the proceeding; and (4) whether the granting of a stay would serve the public interest. *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987); *Dubose v. Pierce*, 761 F.2d 913, 920 (2d Cir.1985); *Metro North State Bank v. The Barrick Group, Inc. (In re The Barrick Group, Inc.)*, 99 B.R. 513, 515 (Bankr.D.Conn.1989). Each factor need not be given equal weight but rather should be used as guides. *Hilton, supra,* 481 U.S. at 777, 107 S.Ct. at 2119 ("[T]he stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a set of rigid rules."); *Standard Havens Products, Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed.Cir.1990); *In re The Barrick Group, Inc., supra,* 99 B.R. at 515.

### Irreparable Harm

■ A showing of probable irreparable harm is the principal prerequisite for the issuance of a stay. Under that test, the moving party must demonstrate that such injury is likely before the other requirements will be considered. *See Reuters Limited v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990); *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983). The moving party is required to show that injury is imminent, not remote or speculative. *Reuters Limited, supra,* 903 F.2d at 907; *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989).[5]

injunction, and that courts considering whether to grant a stay pending appeal commonly rely on preliminary injunction decisions. *See Wisconsin Gas Co. v. F.E.R.C.,* 758 F.2d 669, 674

The issue here turns on whether Bridgeport has proven that it will be irreparably harmed by (1) the entry of a state court order prohibiting it from using the Bond Fund to pay debts arising out of its fiscal year 1991–1992 budget as they become due or requiring it to balance its fiscal year 1991–1992 budget,[6] or (2) the imposition of municipal employee contracts by binding arbitration.[7]

## (1) State Court Order

■ Bridgeport has not sustained the burden of proving that in the absence of a stay it is likely that a state court order will enter prohibiting it from using the Bond Fund or requiring it to balance its budget. The undisputed testimony of David Carson, a member of the FRB, was that in his opinion the FRB can not, will not, and does not want to prevent Bridgeport from using the Bond Fund to pay debts arising out of its fiscal year 1991–1992 budget as they become due, and that, to the contrary, the FRB has always encouraged Bridgeport to pay such debts out of that fund if necessary. Carson's testimony is consistent with § 3 of the Special Act which specifically provides that, in addition to certain other purposes, the Bond Fund "shall be applied ... to fund general fund deficits." Thus, there is no evidence and no reason to believe that the State will at any time in the future seek or be entitled to an order prohibiting Bridgeport from using the Bond Fund to pay debts as they become due or that the state court would enter such an order.

As noted, the July 11 FRB resolution, which ordered Bridgeport to balance its budget, authorized William Cibes, FRB chairman, "to take such other and further action on behalf of this Board, within his discretion, as may be appropriate in the circumstances." *See supra* at 82. Cibes testified that he has not decided whether the FRB will seek a state court order requiring Bridgeport to balance its budget. Bridgeport offered no evidence which undermines that testimony. Moreover, evidence has been presented during Bridgeport's bankruptcy proceedings that Bridgeport can neither raise taxes nor reduce services in an amount sufficient to eliminate the $16,000,000.00 deficit projected in its fiscal year 1991–1992 budget. If a state court were to make such a finding, it might not order Bridgeport to balance its budget on the ground that the Special Act must be read to only require the city to balance its budget if it reasonably can do so.[8] Thus, it cannot be concluded with the requisite degree of certainty that a state court will enter an order requiring Bridgeport to balance its budget.[9]

## (2) Binding Arbitration Awards

■ Herbert Grant, Bridgeport Director of Labor Relations, testified that negotiations on new contracts with eight of the City's thirteen employee unions are at an impasse, that the negotiations will automatically go into binding arbitration on October 1, and that unfavorable binding arbitration awards could negatively impact Bridgeport's reorganization under a chapter 9 plan. However, Patrick Shevlin, the president of one of the unions, testified that binding arbitration could be interrupted by an agreement at any stage of the process, but that if pursued, proceedings typically take one year and sometimes up

(D.C.Cir.1985) (quoting *Ashland Oil, Inc. v. FTC,* 409 F.Supp. 297, 307 (D.D.C.1976)).

6. Section 21(a) of the Special Act provides in part:

    The board ... may apply for a writ of mandamus authorizing any official, employee or agent of the city to carry out or give effect to any order or request of the board authorized by this act.

7. *See* Conn.Gen.Stat. § 7–473c.

8. There are circumstances in which it may not be reasonably possible for a municipality to balance its budget. *See United States v. Bekins,*

304 U.S. 27, 53–54, 58 S.Ct. 811, 816, 82 L.Ed. 1137 (1938) ("Improvement districts, such as the petitioner, were in distress. Economic disaster had made it impossible for them to meet their obligations. As the owners of property within the boundaries of the district could not pay adequate assessments, the power of taxation was useless.").

9. This conclusion is reached without prejudice to Bridgeport's filing another motion for a stay pending appeal if the State attempts to obtain any such state court order.

to three years to complete. That time estimate was not challenged by Bridgeport. Further, Bridgeport offered no persuasive evidence that an unfavorable arbitration award would enter even if the arbitration process was completed. It may well be that Bridgeport has a strong bargaining position and will benefit from binding arbitration.

### III.

Bridgeport has failed to prove that it will be irreparably harmed in the absence of a stay pending appeal, its motion for a stay pending appeal is DENIED, and IT IS SO ORDERED.