**In re CITY OF BRIDGEPORT, Debtor.**

**Bankruptcy No. 91–51519.**

United States Bankruptcy Court,
D. Connecticut.

Sept. 24, 1991.

Barbara Brazzel–Massaro, City Atty., Mark Anastasi, Deputy City Atty., Office of the City Attorney, Richard D. Zeisler, Zeisler & Zeisler, P.C., Bridgeport, Conn., for the City of Bridgeport.

Richard Blumenthal, Atty. Gen., Joan E. Pilver, Asst. Atty. Gen., Hartford, Conn., for State of Conn. and the Bridgeport Financial Review Bd.

## MEMORANDUM ON MOTION FOR RELIEF FROM ORDER UNDER RULE 60(b) FED.R.CIV.P.

ALAN H.W. SHIFF, Bankruptcy Judge.

On September 3, 1991, the City of Bridgeport filed a notice of appeal from this court's August 1, 1991 order sustaining the objection by the State of Connecticut and the Bridgeport Financial Review Board (together the "State") to Bridgeport's chapter 9 petition and dismissing Bridgeport's petition. *In re City of Bridgeport,* 129 B.R. 332, 21 B.C.D. 1546 (Bankr.D.Conn.1991). Bridgeport now moves in this court under Rule 60(b) Fed. R.Civ.P., made applicable by Bankruptcy Rule 9024, for relief from that August 1 order. The issues presented are whether the State has changed its position on Bridgeport's right to use cash from a bond fund and, if so, should the August 1 order be altered or amended. For the reasons that follow, I conclude that if I had jurisdiction to enter an order on the instant motion, it would be denied.[1]

## BACKGROUND

A discussion of Bridgeport's financial dynamics and the State's participation in providing a measure of relief to the City is useful to set the context in which the August 1 order entered.

### 1.

#### Prepetition

Bridgeport, Connecticut, with a population of over 140,000, is Connecticut's largest city. Like many cities in the northeast, Bridgeport has been in financial decline for much of the past decade. Between January 1, 1986 and April 1, 1988, seven manufacturing firms which employed more than 1,700 people left the City. By July, 1989, between four and five million square feet of factory building space was empty. While a service-based economy has emerged and grown, the loss of manufacturing has resulted in a loss of tax revenue because manufacturing is generally more capital intensive than services. Thus, as manufacturing has declined Bridgeport has grown increasingly reliant on residential property taxes, which increased from 52.7% of its total tax base in 1981 to 59.9% in 1986. Bridgeport now has the highest effective tax rate in Connecticut. While Bridgeport's ability to increase revenue declined so did aid from the federal government. At the same time, programs which serve an increasingly dependent population expanded. *July 16 Hearing, Bridgeport Exs.* F, TTT.

Bridgeport's financial condition reached a crisis in its 1987–1988 fiscal year. The City was unable to pay bills as they became due, it had lost access to the bond markets, and in the previous two fiscal years it had accumulated a deficit of approximately $35,000,000.00. *Tr. July 19,* at 44, 126. Bridgeport was "in the condition in which without outside intervention, it clearly could not continue to operate as a city." *Tr. July 19,* at 126 (testimony of David Carson).

The State of Connecticut responded to that crisis by enacting Special Act No. 88–80 on June 9, 1988. Section 1 of that Special Act, as amended[2] (Special Act No. 88–80 and its amendments are hereafter referred to as "the Special Act"), provides:

It is hereby found and declared that a financial emergency exists in the town and city of Bridgeport, that the continued existence of this financial emergency

---

**1.** *See infra* at 91 for the procedure adopted in this circuit on motions for relief under Rule 60(b) Fed.R.Civ.P. after appeal.

**2.** Special Act No. 88–80 was amended by Special Act No. 89–23 (May 24, 1989); Special Act No. 89–47 (June 27, 1989); and Special Act No. 90–31 (June 6, 1990).

is detrimental to the general welfare of the city and the state, [and] that the town and city's continued ability to borrow in the public credit markets and the resolution of this financial emergency is a matter of paramount public interest....

Section 9 of the Special Act created the Bridgeport Financial Review Board ("the FRB") to "review the financial affairs of the town and city of Bridgeport ... in order to maintain access to the public credit markets, to fund the city's accumulated deficits and to restore financial stability to the town and city of Bridgeport." *Special Act,* § 1. Section 3 of the Special Act authorized Bridgeport to issue bonds for the purpose of funding approximately $35,-000,000.00 in budget deficits, incurred in the 1985–1986 and 1986–1987 fiscal years, and creating a reserve fund (hereinafter "the Bond Fund"). The Bond Fund was created to remedy Bridgeport's chronic cash flow problems, which had required it to issue tax anticipation notes at high interest rates and pay vendors over extended periods of time. *Tr. July 19,* at 39. Section 3 provides in part:

The net proceeds of such bonds shall be applied first to repay the principal of and interest on outstanding notes issued in anticipation thereof, second to repay any tax anticipation notes of the city issued and outstanding, third to fund capital account deficits arising from the use of such funds for operations and fourth to fund general fund deficits.

*Special Act,* § 3.

Provisions of sections 11, 12, and 13 of the Special Act mandate that Bridgeport have a balanced budget, *i.e.,* that its revenues equal its expenditures in a given fiscal year. Section 11(b) provides that if the FRB rejects a budget proposed by Bridgeport or the City fails to submit a budget to the FRB for approval, the FRB shall formulate and adopt a budget to be effective until it approves a budget submitted by Bridgeport and the Bridgeport Common Council shall adopt the tax rate required to

balance that interim budget. Section 11(b)(7) provides that the current fiscal year budget shall be regularly reexamined by the FRB and that the City shall make modifications to the budget during the fiscal year if the original revenue or expenditure projections prove inaccurate. Section 21(a) of the Special Act provides in part:

The board ... may apply for a writ of mandamus authorizing any official, employee or agent of the city to carry out or give effect to any order or request of the board authorized by this act.

In January, 1989, Bridgeport issued $58,-315,000.00 in bonds. Pursuant to the Special Act approximately $35,000,000.00 was used to eliminate Bridgeport's accumulated deficit, and the remainder formed the Bond Fund. *Tr. July 19,* at 39–40.

Bridgeport's budgets for fiscal years 1988–1989 and 1989–1990 were in balance, and the City actually finished both years with a small audited surplus. The 1990–1991 fiscal year budget was projected to be balanced, but during that fiscal year the FRB found that an imbalance had developed and ordered Bridgeport to eliminate it. On March 18, 1991, after Bridgeport had failed to act, the FRB obtained a state court order to show cause why a temporary order of mandamus should not issue. *Sept. 12 Hearing, Bridgeport Ex.* 6. The FRB and Bridgeport subsequently compromised their dispute, and it is likely that the City ended the 1990–1991 fiscal year in balance.[3]

On June 3, 1991, Bridgeport's Common Council adopted a budget for the 1991–1992 fiscal year which projects expenditures of $320,225,926 and revenues of $304,180,156, yielding a budget deficit of $16,045,770. Revenues include $169,320,162 of non-tax revenues and property tax revenues of $134,859,994, based on a mill rate of 63.3. *July 16 Hearing, Bridgeport Ex.* R.

2.

Postpetition

On June 6, 1991, Bridgeport filed a petition under chapter 9 of the Bankruptcy

---

**3.** Bridgeport's fiscal year is from July 1 to June 30. It cannot be determined whether a fiscal year ends with a surplus or a deficit until a final

audit is completed. That process is typically concluded in the fall of the succeeding fiscal year.

Code. On June 7, the FRB passed a resolution, pursuant to § 11(b) of the Special Act, adopting an interim budget. The resolution specified that a mill rate of 71.2 was required to balance that interim budget. *Sept. 12 Hearing, Bridgeport Ex.* 1. On June 10, the Bridgeport Common Council adopted a mill rate of 63.3 which, as noted, was projected to yield a budget deficit of approximately $16,000,000.00 in fiscal year 1991–1992.

On June 12, the State filed an objection to the petition, *see* 11 U.S.C. § 921(c), asserting that Bridgeport was not generally authorized to be a debtor under chapter 9 by state law, that Bridgeport was not insolvent when it filed its petition, and that the petition was filed in bad faith. *See* 11 U.S.C. § 109(c).[4] On June 13, the FRB passed a resolution ordering the Common Council to adopt a tax rate of 71.2 mills. On June 21, the State filed an amended objection, asserting that the mayor of Bridgeport was not properly authorized by the Common Council to file the petition.

On July 22, an order entered holding that "Bridgeport was generally authorized by state law to be a debtor prior to the passage of the Special Act; the Special Act did not eliminate that authority; and the Special Act did not empower the FRB to prohibit Bridgeport from filing a petition." *In re City of Bridgeport*, 128 B.R. 688, 703 (Bankr.D.Conn.1991). Accordingly, I overruled the State's objection under Code § 109(c)(2). *See supra* note 4. Familiarity with that order is assumed.

On August 1, an order entered, after a July 16–23 hearing, holding that the Code definition of municipal insolvency, *see* § 101(32)(C)(ii),[5] requires a prospective analysis from the petition date; that municipal insolvency is determined by a cash flow, not a budget deficiency, analysis; and "that to be found insolvent a city must prove that it will be unable to pay its debts as they become due in its current fiscal year or, based on an adopted budget, in its next fiscal year." *In re City of Bridgeport, supra*, 129 B.R. 332, 21 B.C.D. at 1548–49. Familiarity with that order is assumed. *See also In re City of Bridgeport*, 132 B.R. 81, 82 (Bankr.D.Conn., 1991) ("['Based on an adopted budget, in its next fiscal year'] was added to the definition to limit the time frame of the analysis, so that a determination of insolvency is not based upon a projection of what revenue and expenses might be included in unadopted budgets."). Based on that standard, I found that Bridgeport was not insolvent because, although it had a projected fiscal year 1991–1992 budget deficit of $16,000,000.00, it started the fiscal year with approximately $27,908,513.00 in cash, and it intended to and would be allowed by the State to use that cash to fund that deficit.[6] Accordingly, I sustained the State's objection and dismissed Bridgeport's petition.

The conclusion that the State took the position that the City would be permitted to use the cash and would not be required to raise taxes or cut expenditures from the levels projected in the budget was based on the following:

**4.** Bankruptcy Code § 921(c) provides:

After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title.
Code § 109(c) provides:
An entity may be a debtor under chapter 9 of this title if and only if such entity—

. . . .

(2) is generally authorized to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent; [and]

(4) desires to effect a plan to adjust such debts. . . .

**5.** Code § 101(32) provides:
"insolvent" means—

. . . .

(C) with reference to a municipality, financial condition such that the municipality is—

(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or

(ii) unable to pay its debts as they become due. . . .

**6.** As noted *infra* at 91, the basis for the instant motion is that the State now takes a different position.

(1) On July 19, Frank Borges, the Connecticut State Treasurer and a member of the FRB, testified as follows:

Q: (by Richard Blumenthal, Attorney General): Let me ask you, is the City permitted to use that $27 million to pay its debts as they come due?

A: (by Borges): Yes, it is, as a matter of fact. The City, I believe, in the past has.... [T]hat is cash that is available to the City....

....

[The City borrowed] roughly 58 and a half million, almost 60 million, to do two things. One, to erase the accumulated deficit. And secondly, to eliminate what had been a structural problem for the City. That's giving it a cushion to allow it to be able to meet its obligations when due, absent having to do the variety of short term borrowings the City had traditionally done, all at a very high interest rate.

Q: And if a part of that 27 million is used during this fiscal year, when would it be refunded?

A: Well, the way it works is that you really wouldn't know where you are until at the end of the fiscal year.... [A]t the end of the fiscal year it usually takes the City two to three months to close the books, and ultimately we're looking at somewhere around November of '92 getting an audit....

....

Essentially, if the $25 million were used, [we] probably would know exactly what it is after we receive the audit, and the audit would not be received until November. The City at that time could make a decision that it wants to close it with some cuts or revenue enhancements at that period of time or it could fund it in the next fiscal year. So you really end up almost two years out.

Q: So, just to clarify that answer, we're now in '91–'92. If the city were to use any part of it in '91–'92, it would close the books on '92, then sometime in November of '92 take some action to replenish it or in the following fiscal year, that is, '93–'94 possibly replenish it. Is that a fair summary?

A: That's correct.

*Tr. July 19*, at 38–40, 42–43.

(2) On July 19, Philip Dearborn, the State's expert witness, testified as follows:

Q (by Richard Blumenthal): Now, let me ask you, Mr. Dearborn, based on your past experience, your background, and based on the information that has been made available to you, were you able to formulate an opinion as to the solvency of the City of Bridgeport?

A (by Dearborn): Solvency, I consider to mean being able to meet current obligations as they come due. And on that basis, yes, I have.

Q: And what is your opinion, sir?

A: I have concluded that at the time bankruptcy was declared, the City was solvent and that it will remain solvent into the foreseeable future.

Q: And would you tell his Honor, if you would please, what the basis is for that opinion?

A: The basis for that opinion is the fact that the June 30th, 1990 financial statement had [a] little under $30 million dollars in cash in the general fund, plus some—substantial amount of cash and some other funds.

The fact that the City, I believe, finished this year with a balanced budget of maybe even a slight surplus so that the condition of the government should not be—change from what it was on June 30th, 1990. The City's cash flow projection for fiscal year 1992, I have reviewed, it appears to me to be professionally done. I saw no reason to think that there would be a great deal of variance from that projection, and it does project a positive cash flow on a month to month basis throughout fiscal year 1992. I believe that going into and my guess would be through 1993, that there should be continued cash, favorable cash position taking all of that into account.

*Tr. July 19*, at 161–62.

(3) In his July 23, closing argument, Attorney General Richard Blumenthal stated:

[T]he City is not insolvent, was not insolvent on the day of the filing, is not insolvent now, will not be insolvent in the foreseeable future. It was, and is, and will pay its debts as they come due. It was, and is, and will for the foreseeable future, pay all of the wages and benefits of its employees, pay its vendors and trade creditors within 30 days, and will pay all its bondholders.... [T]hese facts are really pretty much uncontroverted.... [These facts are] part of the testimony of Mr. Reddy and Mr. Robinson, they're part of Exhibit S.... Exhibit S shows that at the end of this fiscal year, the city will have a cash reserve of 12.5 million dollars.

So the City's cash position is essentially healthy.... At the end of the fiscal year it had $27,000,000.... [A]ccording to its own projections, it will have money in the bank, more than enough in the bank at the end of this coming fiscal year. And this cash is available to pay debts as they come due. The fact that part of it may have been borrowed initially illustrates precisely the purpose of that cash reserve as Mr. Borges testified. It was to guarantee that the City would not have to do any short term borrowing, would not be threatened with bankruptcy as it was in 1988, and that money can be replenished at any point in the future as far in advance in the future as fiscal years '93 and '94....

*Tr. July 23,* at 27–29.

· (4) Exhibit S, which is attached here as Appendix A and was referred to by the quoted witnesses and relied upon by the State in its closing argument, is a cash flow projection for the 1991–1992 fiscal year. It shows that Bridgeport's cash balance will drop from approximately $28,000,000.00 on the first day of the fiscal year, July 1, 1991, to approximately $12,000,000.00 on June 30, 1992, the last day of the fiscal year.

(5) On July 31, the State filed a post-trial memorandum of law in which it stated that the "City's own conservative 'Projected Summary of Cash Flow' ... shows a posi-

tive cash balance of more than $12.5 million at the end of FY 1991–92. Ex. S."

*See also Tr. July 17,* at 275–77 (Testimony of Mahesh Reddy that Exhibit S contemplates that Bridgeport will use $16,000,-000.00 from the Bond Fund, thereby reducing its cash position from $28,000,000.00 to $12,000,000.00); *Tr. July 18,* at 103–07 (Testimony of Richard Robinson that Exhibit S shows that Bridgeport's cash position will drop by $16,000,000.00 during the fiscal year).

3.

## Post August 1 order

By a letter dated August 19, Bridgeport informed the State that "the City plans to balance the FY 1991–1992 Operating Budget by utilizing the cash assets which the City estimated to be $27,000,000.00 per our cash flow analysis." *Sept. 12 Hearing, Bridgeport* Ex. 3. By a letter dated August 29, William Cibes, Chairman of the FRB and Director of the State Office of Policy and Management, responded to Bridgeport's August 19 letter, stating that

the plan you outline "to balance the FY 1991–1992 operating budget by utilizing the (City's) cash assets" is not in conformance with the budget provisions of S.A. 88–80 (as amended) and is unresponsive to the Board's order of July 11 (copy enclosed).

The Act requires that the City's General Fund Budget be balanced; that is, revenues budgeted to be received during the year must be equal to appropriated expenditures. Cash assets are not revenues, and cannot be used to balance the budget. Cash and revenue are two wholly distinct financial concepts. The City's "Cash Reserve" was counted as revenue in FY 1988–89. It cannot be counted again. Simply put, cash is used to pay bills; revenue is used to balance the budget.

*Sept. 12 Hearing, Bridgeport* Ex. 2.

At a September 12 hearing on Bridgeport's motion for a stay pending appeal,[7]

---

7. On August 7, Bridgeport was granted an extension of time until September 3 to file an appeal

of the August 1 order. On August 23, Bridgeport filed a motion for a stay pending appeal,

Cibes testified that although Bridgeport could use the Bond Fund to meet its obligations as they become due, the City must balance its budget this fiscal year and cannot use the Bond Fund as revenue to balance the budget. At that hearing Richard Bodine, a member of the FRB, testified that in his opinion raising taxes and/or reducing expenditures was the only way to balance the budget absent a major increase in federal or state aid. On September 6, Bridgeport filed the instant motion for relief under subsections (1), (2), (3), (5), and (6) of Rule 60(b) Fed.R.Civ.P.

In support of its motion, Bridgeport argues that contrary to the position the State adopted during the July 16–23 trial, *see supra* at 88–90, the State now takes the position that Bridgeport must balance its budget this fiscal year and must replenish any money used from the Bond Fund this fiscal year. Bridgeport argues that the consequence of the State's current position is that it does not have access to the Bond Fund this fiscal year and is therefore insolvent. The State responds that its position has been consistent throughout these proceedings and that Bridgeport is not insolvent.

### DISCUSSION

#### 1.

■ The appeal of the August 1 order deprived this court of jurisdiction to rule on Bridgeport's motion under Rule 60(b). *Contemporary Mission, Inc. v. U.S. Postal Service,* 648 F.2d 97, 107 (2d Cir.1981). However, the Second Circuit has approved as "proper and calculated to be most economical of the efforts of courts and parties" a procedure under which this court may promptly consider the Rule 60(b) motion and determine whether it would be granted if it had jurisdiction. If the motion would be granted, the court may notify Bridgeport which may then seek remand of the case for the limited purpose of ruling on the motion. *Litton Systems, Inc. v.*

which was denied on September 12. *In re City of Bridgeport,* 132 B.R. 81 (Bankr.D.Conn.1991).

*American Telephone & Telegraph Co.,* 746 F.2d 168, 171 n. 4 (2d Cir.1984); *Ryan v. United States Lines Co.,* 303 F.2d 430, 434 (2d Cir.1962); *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.,* 683 F.Supp. 979, 980 (S.D.N.Y.1988).

Rule 60(b) Fed.R.Civ.P., made applicable by Bankruptcy Rule 9024, provides in relevant part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

■ Rule 60(b) strikes a balance between preserving the finality of judgments, which should not be lightly reopened, and serving the ends of justice. *Nemaizer v. Baker,* 793 F.2d 58, 61 (2d Cir.1986). A showing of exceptional circumstances is required before relief is appropriately given under Rule 60(b), as the rule provides for extraordinary judicial relief. *Id.*

For relief under subsections (1), (2), (5), and (6), Bridgeport must prove that the State changed its position and that the new position warrants the conclusion that Bridgeport was insolvent when it filed its chapter 9 petition. *E.g., Maguire v. Wilkinson,* 405 F.Supp. 637, 641 (D.Conn.1975) (60(b)(1)); *McKnight v. United States Steel Corp.,* 726 F.2d 333, 336 (7th Cir.1984) (60(b)(2)); *DeFilippis v. United States,* 567 F.2d 341, 344 (7th Cir.1977) (60(b)(5)); [8] *De-*

8. In *DeFilippis* the court held that relief under Rule 60(b)(5) requires proof that "a change in conditions ... makes continued enforcement

*Markey v. Greenwich Hospital Ass'n,* 454 F.Supp. 351, 354 (D.Conn.1978) (60(b)(6)); *FDIC v. Alker,* 30 F.R.D. 527, 532 (E.D.Pa. 1962) (60(b)(6)). For relief under subsection (3), Bridgeport must prove that the State changed its position and that its original position misled the city, so that it did not fully and fairly present its case. *E.g., Maudlin v. M/V Peacock (In re M/V Peacock),* 809 F.2d 1403, 1404–05 (9th Cir. 1987).

2.

■ The State's position with respect to the Bond Fund is different from the position it took at the July 16–23 hearing. At that hearing, the State relied upon and adopted Bridgeport's Exhibit S to assert that the City could use the Bond Fund to pay its obligations under its 1991–1992 budget. *See supra* at 88–90. Exhibit S is the City's projection of its cash flow for the 1991–1992 fiscal year. That cash flow analysis is based upon the existence of a budget deficit for the fiscal year and projects that Bridgeport's cash will decline from approximately $28,000,000.00 at the beginning of the fiscal year to approximately $12,000,000.00 at the end of the fiscal year. If Bridgeport balanced its budget, it would have approximately the same amount of cash at the end of the fiscal year as it had at the beginning, rather than $16,000,000.00 less as demonstrated in Exhibit S. Exhibit S and a balanced budget are mutually exclusive. Thus, the State's position, relying on Exhibit S, that the City could use the Bond Fund to pay bills assumed that Bridgeport's 1991–1992 budget would not be balanced. The State now says that Bridgeport's 1991–1992 budget must be balanced and that the City cannot use the Bond Fund as revenue to do so.

I need not, however, determine whether the State's change in position is sufficient to justify relief under Rule 60(b), as Bridgeport has failed to prove either of the other elements of the test, *i.e.,* that the change in the State's position requires an alteration of the August 1 order because it proves that Bridgeport was insolvent when it filed for relief under chapter 9 or that Bridgeport was prevented from fully and fairly presenting its case at the July 16–23 hearing.

The State's position that Bridgeport must balance its 1991–1992 budget does not alter the conclusion that Bridgeport is solvent. If Bridgeport is able to and does raise taxes and/or reduce spending enough to balance its budget, it will be able to pay its bills as they become due. *See Special Act,* § 3, *supra* at 87. If, on the other hand, Bridgeport is unable to balance its budget, it will have an operating deficit, and it will be able to use the Bond Fund to pay its debts as they become due. The first scenario is a self evident statement of solvency. The second requires a bit more clarification.

■ Although a literal reading of the Special Act requires that Bridgeport have a balanced budget, statutes must be construed under the assumptions that the legislature intended a reasonable and rational result and that the legislature intended exceptions to statutes where necessary to avoid unjust, oppressive, or absurd consequences. *E.g., Rector of Holy Trinity Church v. United States,* 143 U.S. 457, 461, 12 S.Ct. 511, 512–13, 36 L.Ed. 226 (1892); *United States v. Mendoza,* 565 F.2d 1285, 1288 (5th Cir.1978), *modified,* 581 F.2d 89 (5th Cir.1978); *Windham First Taxing District v. Windham,* 208 Conn. 543, 553, 546 A.2d 226 (1988).[9] Moreover,

inequitable." *DeFilippis, supra,* 567 F.2d at 344. If a change in conditions would not produce a different result, continued enforcement of a judgment would not be inequitable.

**9.** The Court in *Holy Trinity, supra,* 143 U.S. at 461, 12 S.Ct. at 512–13, remarked:

The common sense of man approves the judgement mentioned by Paffendorf, that the Bolognian law which enacted "that whoever drew blood in the streets should be punished

with the utmost severity," did not extend to the surgeon who opened the vein of a person that fell down in the streets in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1 Edw. II., which enacts that a prisoner who breaks prison shall be guilty of a felony, does not extend to a prisoner who breaks out when the prison is on fire, "for he is not to be hanged because he would not stay to be burnt."

it is assumed that the legislature enacts statutes with existing statutes in mind and intends to create one consistent body of law, so that it is the duty of courts to find "by any fair interpretation ... a reasonable field of operation for two allegedly inconsistent statutes, without destroying or preventing their evident meaning and intent...." *Windham First Taxing District, supra,* 208 Conn. at 553, 546 A.2d 226. *See also Caulfield v. Noble,* 178 Conn. 81, 93, 420 A.2d 1160 (1979).

The provision of adequate services by government is a prerequisite to civilized living in modern urban centers. As noted in this court's July 22 order, Connecticut has delegated to its cities the duty to provide their residents with a wide variety of necessary services. *In re City of Bridgeport, supra,* 128 B.R. at 698. To enable Connecticut cities to provide for the public safety, health, and general welfare of its residents and business community, Connecticut General Statutes § 7–194 provides:

> [A]ll towns, cities or boroughs which have a charter or which adopt or amend a charter under the provisions of this chapter shall have the following specific powers in addition to all powers granted to towns, cities and boroughs under the constitution and general statutes: To manage, regulate and control the finances and property, real and personal, of the town, city or borough and to regulate and provide for the sale, conveyance, transfer and release of town, city or borough property and to provide for the execution of contracts and evidences of indebtedness issued by the town, city or borough.

Further, Connecticut General Statutes § 7–148(c) empowers cities to, *inter alia,* make contracts, institute actions and proceedings, establish and maintain a budget, assess and collect taxes, borrow, purchase property, provide for public services such as fire and police, and construct public works such as highways and sewers.

It is obvious that a city can only provide an adequate level of necessary services if it can pay for them. *See In re City of Bridgeport, supra,* 128 B.R. at 698. It is equally true that there is a point beyond which a city, or any government, can no

longer raise taxes. *See United States v. Bekins,* 304 U.S. 27, 53–54, 58 S.Ct. 811, 816, 82 L.Ed. 1137 (1938) ("Improvement districts, such as the petitioner, were in distress. Economic disaster had made it impossible for them to meet their obligations. As the owners of property within the boundaries of the district could not pay adequate assessments, the power of taxation was useless."). At some level of taxation, taxpayers will either leave or be unable to pay, and a tax rate increase will reduce the amount of taxes collected.

Theoretically, Bridgeport can balance its 1991–1992 budget. It could, for example, terminate most of its police, fire and sanitation personnel or double its tax rate. The former option would be in derogation of its duties to its residents; the latter would be absurd, impractical, and unjust. Accordingly, the Special Act requirement that Bridgeport balance its budget must be read in light of its home rule obligations and the practical reality that there is a limit on the amount of taxes which can be paid. The Connecticut legislature could not have intended that there be slavish adherence to the balanced budget requirement at the expense of the well being of Bridgeport's residents. Therefore, I conclude that the Special Act should be interpreted only to require Bridgeport to balance its budget if it is reasonably able to do so.

If Bridgeport is not reasonably able to balance its budget, it will have the right to use the Bond Fund to pay debts arising out of its unbalanced budget as they become due. As noted, § 3 of the Special Act provides that the Bond Fund "shall be applied ... to fund general fund deficits." A general fund deficit may be caused by an inability to balance the budget, and a deficit caused by such a circumstance is not excepted from the statute. The FRB cannot create such an exception, and any attempt to do so would be void and without legal effect. *Young v. Chase,* 18 Conn. App. 85, 557 A.2d 134, 138 (1989), *cert. denied,* 211 Conn. 807, 559 A.2d 1141 (1989); *Waterbury v. Commission on Hu-*

*man Rights & Opportunities,* 160 Conn. 226, 230, 278 A.2d 771 (1971) ("[An administrative body] cannot modify, abridge or otherwise change the statutory provisions under which it acquires authority unless the statutes expressly grant it that power.").

Bridgeport has presented no evidence and, indeed, made no argument that it was prevented from fully and fairly presenting its case at the July 16–23 hearing.

## CONCLUSION

Even assuming that the State's change in position from the position it took during the July 16–23 hearing rose to the level of one of the Rule 60(b) grounds for relief, Bridgeport has not, and indeed cannot, demonstrate that the August 1 order should be altered or amended. Therefore, if I had jurisdiction to enter an order on this motion, it would be denied.

## APPENDIX A
## BRIDGEPORT EXHIBIT S

CITY OF BRIDGEPORT
GENERAL FUND
PROJECTED SUMMARY OF CASH FLOWS FY91–92
JULY 12, 1991 DRAFT

|  | JULY 91 | ACTUAL | VARIANCE |
|---|---|---|---|
| BALANCE—BEGINNING CASH |  |  |  |
| CASH | 755,690 | 0 | 755,690 |
| INVESTMENTS | 38,815,823 | 0 | 38,815,823 |
| LESS: VENDOR FLOAT | (3,201,000) |  | (3,201,000) |
| PAYROLL FLOAT | (8,462,000) |  | (8,462,000) |
| NET—BEGINNING CASH | 27,908,513 | 0 | 27,908,513 |
| ADD REVENUES: |  |  |  |
| PROPERTY TAX | 17,242,113 | 0 | 17,242,113 |
| LESS: TAX INTERCEPT 21.3377%/17.3534% | 3,679,070 | 0 | 3,679,070 |
| NET TAX AFTER INTERCEPT | 13,563,043 | 0 | 13,563,043 |
| OTHER REVENUES: |  |  |  |
| STATE REVENUES | 158,351 | 0 | 158,351 |
| DEPARTMENTAL, OTHER AND CASH TRANSFERS | 2,450,229 | 0 | 2,450,229 |
| TOTAL OTHER REVENUES | 2,608,580 | 0 | 2,608,580 |
| TOTAL REVENUES | 16,171,623 | 0 | 16,171,623 |
| LESS EXPENDITURES: |  |  |  |
| PAYROLL (GROSS) | 6,288,674 | 0 | 6,288,674 |
| VENDOR PAYMENTS AND CASH TRANSFERS | 13,517,193 | 0 | 13,517,193 |
| TOTAL EXPENDITURES | 19,805,866 | 0 | 19,805,866 |
| ENDING CASH BALANCE | 24,274,269 | 0 | 24,274,269 |

|  | AUGUST 91 | ACTUAL | VARIANCE |
|---|---|---|---|
| BALANCE—BEGINNING CASH |  |  |  |
| CASH |  |  | 0 |
| INVESTMENTS |  |  | 0 |
| LESS: VENDOR FLOAT |  |  | 0 |
| PAYROLL FLOAT |  |  | 0 |
| NET—BEGINNING CASH | 24,274,269 | 0 | 24,274,269 |
| ADD REVENUES: |  |  |  |
| PROPERTY TAX | 47,857,696 | 0 | 47,857,696 |
| LESS: TAX INTERCEPT 21.3377%/17.3534% | 10,211,732 | 0 | 10,211,732 |
| NET TAX AFTER INTERCEPT | 37,645,964 | 0 | 37,645,964 |
| OTHER REVENUES: |  |  |  |
| STATE REVENUES | 964,028 | 0 | 964,028 |
| DEPARTMENTAL, OTHER AND CASH TRANSFERS | 2,452,474 | 0 | 2,452,474 |
| TOTAL OTHER REVENUES | 3,416,501 | 0 | 3,416,501 |
| TOTAL REVENUES | 41,062,465 | 0 | 41,062,465 |

| | AUGUST 91 | ACTUAL | VARIANCE |
|---|---:|---:|---:|
| **LESS EXPENDITURES:** | | | |
| PAYROLL (GROSS) | 7,185,769 | 0 | 7,185,769 |
| VENDOR PAYMENTS AND CASH TRANSFERS | 13,517,193 | 0 | 13,517,193 |
| TOTAL EXPENDITURES | 20,702,962 | 0 | 20,702,962 |
| **ENDING CASH BALANCE** | 44,633,773 | 0 | 44,633,773 |

| | SEPTEMBER 91 | ACTUAL | VARIANCE |
|---|---:|---:|---:|
| **BALANCE—BEGINNING CASH** | | | |
| CASH | | | |
| INVESTMENTS | | | |
| LESS: VENDOR FLOAT | | | |
| PAYROLL FLOAT | | | |
| NET—BEGINNING CASH | 44,633,773 | 0 | 44,633,773 |
| **ADD REVENUES:** | | | |
| PROPERTY TAX | 2,066,498 | 0 | 2,066,498 |
| LESS: TAX INTERCEPT 21.3377%/17.3534% | 440,943 | 0 | 440,943 |
| NET TAX AFTER INTERCEPT | 1,625,555 | 0 | 1,625,555 |
| **OTHER REVENUES:** | | | |
| STATE REVENUES | 7,747,199 | 0 | 7,747,199 |
| DEPARTMENTAL, OTHER AND CASH TRANSFERS | 2,550,017 | 0 | 2,550,017 |
| TOTAL OTHER REVENUES | 10,297,216 | 0 | 10,297,216 |
| TOTAL REVENUES | 11,922,771 | 0 | 11,922,771 |
| **LESS EXPENDITURES:** | | | |
| PAYROLL (GROSS) | 10,409,379 | 0 | 10,409,379 |
| VENDOR PAYMENTS AND CASH TRANSFERS | 13,517,193 | 0 | 13,517,193 |
| TOTAL EXPENDITURES | 23,926,572 | 0 | 23,926,572 |
| **ENDING CASH BALANCE** | 32,629,972 | 0 | 32,629,972 |

| | OCTOBER 91 | ACTUAL | VARIANCE |
|---|---:|---:|---:|
| **BALANCE—BEGINNING CASH** | | | |
| CASH | | | |
| INVESTMENTS | | | |
| LESS: VENDOR FLOAT | | | |
| PAYROLL FLOAT | | | |
| NET—BEGINNING CASH | 32,629,972 | 0 | 32,629,972 |
| **ADD REVENUES:** | | | |
| PROPERTY TAX | 1,897,962 | 0 | |
| LESS: TAX INTERCEPT 21.3377%/17.3534% | 404,981 | 0 | 0 |
| NET TAX AFTER INTERCEPT | 1,492,980 | 0 | 1,492,980 |
| **OTHER REVENUES:** | | | |
| STATE REVENUES | 7,086,124 | 0 | 7,086,124 |
| DEPARTMENTAL, OTHER AND CASH TRANSFERS | 2,532,590 | 0 | 2,532,590 |
| TOTAL OTHER REVENUES | 9,618,714 | 0 | 9,618,714 |
| TOTAL REVENUES | 11,111,694 | 0 | 11,111,694 |
| **LESS EXPENDITURES:** | | | |
| PAYROLL (GROSS) | 10,409,379 | 0 | 10,409,379 |
| VENDOR PAYMENTS AND CASH TRANSFERS | 13,517,193 | 0 | 13,517,193 |
| TOTAL EXPENDITURES | 23,926,572 | 0 | 23,926,572 |
| **ENDING CASH BALANCE** | 19,815,094 | 0 | 19,815,094 |

| | NOVEMBER 91 | ACTUAL | VARIANCE |
|---|---:|---:|---:|
| **BALANCE—BEGINNING CASH** | | | |
| CASH | | | 0 |
| INVESTMENTS | | | 0 |

| | NOVEMBER 91 | ACTUAL | VARIANCE |
|---|---|---|---|
| LESS: VENDOR FLOAT | | | 0 |
| PAYROLL FLOAT | | | 0 |
| NET—BEGINNING CASH | 19,815,094 | 0 | 19,815,094 |
| ADD REVENUES: | | | |
| PROPERTY TAX | 1,483,464 | 0 | 1,483,464 |
| LESS: TAX INTERCEPT 21.3377%/17.3534% | 316,537 | 0 | 316,537 |
| NET TAX AFTER INTERCEPT | 1,166,927 | 0 | 1,166,927 |
| OTHER REVENUES: | | | |
| STATE REVENUES | 18,374,055 | 0 | 18,374,055 |
| DEPARTMENTAL, OTHER AND CASH TRANSFERS | 2,233,677 | 0 | 2,233,677 |
| TOTAL OTHER REVENUES | 20,607,732 | 0 | 20,607,732 |
| TOTAL REVENUES | 21,774,659 | 0 | 21,774,659 |
| LESS EXPENDITURES: | | | |
| PAYROLL (GROSS) | 14,716,973 | 0 | 14,716,973 |
| VENDOR PAYMENTS AND CASH TRANSFERS | 13,517,193 | 0 | 13,517,193 |
| TOTAL EXPENDITURES | 28,234,166 | 0 | 28,234,166 |
| ENDING CASH BALANCE | 13,355,588 | 0 | 13,355,588 |

| | DECEMBER 91 | ACTUAL | VARIANCE |
|---|---|---|---|
| BALANCE—BEGINNING CASH | | | |
| CASH | | | 0 |
| INVESTMENTS | | | 0 |
| LESS: VENDOR FLOAT | | | 0 |
| PAYROLL FLOAT | | | 0 |
| NET—BEGINNING CASH | 13,355,588 | 0 | 13,355,588 |
| ADD REVENUES: | | | |
| PROPERTY TAX | 4,237,655 | 0 | 4,237,655 |
| LESS: TAX INTERCEPT 21.3377%/17.3534% | 904,218 | 0 | 904,218 |
| NET TAX AFTER INTERCEPT | 3,333,437 | 0 | 3,333,437 |
| OTHER REVENUES: | | | |
| STATE REVENUES | 12,488,578 | 0 | 12,488,578 |
| DEPARTMENTAL, OTHER AND CASH TRANSFERS | 2,243,153 | 0 | 2,243,153 |
| TOTAL OTHER REVENUES | 14,731,731 | 0 | 14,731,731 |
| TOTAL REVENUES | 18,065,168 | 0 | 18,065,168 |
| LESS EXPENDITURES: | | | |
| PAYROLL (GROSS) | 11,940,334 | 0 | 11,940,334 |
| VENDOR PAYMENTS AND CASH TRANSFERS | 13,517,193 | 0 | 13,517,193 |
| TOTAL EXPENDITURES | 25,457,527 | 0 | 25,457,527 |
| ENDING CASH BALANCE | 5,963,229 | 0 | 5,963,229 |

| | JANUARY 92 | ACTUAL | VARIANCE |
|---|---|---|---|
| BALANCE—BEGINNING CASH | | | |
| CASH | | | 0 |
| INVESTMENTS | | | 0 |
| LESS: VENDOR FLOAT | | | 0 |
| PAYROLL FLOAT | | | 0 |
| NET—BEGINNING CASH | 5,963,229 | 0 | 5,963,229 |
| ADD REVENUES: | | | |
| PROPERTY TAX | 37,021,257 | 0 | 37,021,257 |
| LESS: TAX INTERCEPT 21.3377%/17.3534% | 6,424,447 | 0 | 6,424,447 |
| NET TAX AFTER INTERCEPT | 30,596,810 | 0 | 30,596,810 |
| OTHER REVENUES: | | | |
| STATE REVENUES | 8,205,630 | 0 | 8,205,630 |
| DEPARTMENTAL, OTHER AND CASH TRANSFERS | 2,282,350 | 0 | 2,282,350 |

|  | JANUARY 92 | ACTUAL | VARIANCE |
|---|---|---|---|
| TOTAL OTHER REVENUES | 10,487,979 | 0 | 10,487,979 |
| TOTAL REVENUES | 41,084,790 | 0 | 41,084,790 |
| **LESS EXPENDITURES:** |  |  |  |
| PAYROLL (GROSS) | 11,306,474 | 0 | 11,306,474 |
| VENDOR PAYMENTS AND CASH TRANSFERS | 13,517,193 | 0 | 13,517,193 |
| TOTAL EXPENDITURES | 24,823,667 | 0 | 24,823,667 |
| ENDING CASH BALANCE | 22,224,352 | 0 | 22,224,352 |

|  | FEBRUARY 92 | ACTUAL | VARIANCE |
|---|---|---|---|
| **BALANCE—BEGINNING CASH** |  |  |  |
| CASH |  |  | 0 |
| INVESTMENTS |  |  | 0 |
| LESS: VENDOR FLOAT |  |  | 0 |
| PAYROLL FLOAT |  |  | 0 |
| NET—BEGINNING CASH | 22,224,352 | 0 | 22,224,352 |
| **ADD REVENUES:** |  |  |  |
| PROPERTY TAX | 22,713,089 | 0 | 22,713,089 |
| LESS: TAX INTERCEPT 21.3377%/17.3534% | 3,941,493 | 0 | 3,941,493 |
| NET TAX AFTER INTERCEPT | 18,771,596 | 0 | 18,771,596 |
| **OTHER REVENUES:** |  |  |  |
| STATE REVENUES | 18,861,049 | 0 | 18,861,049 |
| DEPARTMENTAL, OTHER AND CASH TRANSFERS | 2,327,757 | 0 | 2,327,757 |
| TOTAL OTHER REVENUES | 21,188,806 | 0 | 21,188,806 |
| TOTAL REVENUES | 39,960,402 | 0 | 39,960,402 |
| **LESS EXPENDITURES:** |  |  |  |
| PAYROLL (GROSS) | 10,409,379 | 0 | 10,409,379 |
| VENDOR PAYMENTS AND CASH TRANSFERS | 13,517,193 | 0 | 13,517,193 |
| TOTAL EXPENDITURES | 23,926,572 | 0 | 23,926,572 |
| ENDING CASH BALANCE | 38,258,182 | 0 | 38,258,182 |

|  | MARCH 92 | ACTUAL | VARIANCE |
|---|---|---|---|
| **BALANCE—BEGINNING CASH** |  |  |  |
| CASH |  |  | 0 |
| INVESTMENTS |  |  | 0 |
| LESS: VENDOR FLOAT |  |  | 0 |
| PAYROLL FLOAT |  |  | 0 |
| NET—BEGINNING CASH | 38,258,182 | 0 | 38,258,182 |
| **ADD REVENUES:** |  |  |  |
| PROPERTY TAX | 1,898,390 | 0 | 1,898,390 |
| LESS: TAX INTERCEPT 21.3377%/17.3534% | 329,435 | 0 | 329,435 |
| NET TAX AFTER INTERCEPT | 1,568,954 | 0 | 1,568,954 |
| **OTHER REVENUES:** |  |  |  |
| STATE REVENUES | 8,983,368 | 0 | 8,983,368 |
| DEPARTMENTAL, OTHER AND CASH TRANSFERS | 2,473,123 | 0 | 2,473,123 |
| TOTAL OTHER REVENUES | 11,456,491 | 0 | 11,456,491 |
| TOTAL REVENUES | 13,025,445 | 0 | 13,025,445 |
| **LESS EXPENDITURES:** |  |  |  |
| PAYROLL (GROSS) | 10,409,379 | 0 | 10,409,379 |
| VENDOR PAYMENTS AND CASH TRANSFERS | 13,517,193 | 0 | 13,517,193 |
| TOTAL EXPENDITURES | 23,926,572 | 0 | 23,926,572 |
| ENDING CASH BALANCE | 27,357,056 | 0 | 27,357,056 |

|  | APRIL 92 | ACTUAL | VARIANCE |
|---|---:|---:|---:|
| **BALANCE—BEGINNING CASH** | | | |
| CASH | | | 0 |
| INVESTMENTS | | | 0 |
| LESS: VENDOR FLOAT | | | 0 |
| PAYROLL FLOAT | | | 0 |
| NET—BEGINNING CASH | 27,357,056 | 0 | 27,357,056 |
| **ADD REVENUES:** | | | |
| PROPERTY TAX | 2,412,412 | 0 | 2,412,412 |
| LESS: TAX INTERCEPT 21.3377%/17.3534% | 418,635 | 0 | 418,635 |
| NET TAX AFTER INTERCEPT | 1,993,776 | 0 | 1,993,776 |
| **OTHER REVENUES:** | | | |
| STATE REVENUES | 581,708 | 0 | 581,708 |
| DEPARTMENTAL, OTHER AND CASH TRANSFERS | 3,879,645 | 0 | 3,879,645 |
| TOTAL OTHER REVENUES | 4,461,353 | 0 | 4,461,353 |
| TOTAL REVENUES | 6,455,130 | 0 | 6,455,130 |
| **LESS EXPENDITURES:** | | | |
| PAYROLL (GROSS) | 10,409,379 | 0 | 10,409,379 |
| VENDOR PAYMENTS AND CASH TRANSFERS | 13,517,193 | 0 | 13,517,193 |
| TOTAL EXPENDITURES | 23,926,572 | 0 | 23,926,572 |
| ENDING CASH BALANCE | 9,885,614 | 0 | 9,885,614 |

|  | MAY 92 | ACTUAL | VARIANCE |
|---|---:|---:|---:|
| **BALANCE—BEGINNING CASH** | | | |
| CASH | | | 0 |
| INVESTMENTS | | | 0 |
| LESS: VENDOR FLOAT | | | 0 |
| PAYROLL FLOAT | | | 0 |
| NET—BEGINNING CASH | 9,885,614 | 0 | 9,885,614 |
| **ADD REVENUES:** | | | |
| PROPERTY TAX | 1,844,349 | 0 | 1,844,349 |
| LESS: TAX INTERCEPT 21.3377%/17.3534% | 320,057 | 0 | 320,057 |
| NET TAX AFTER INTERCEPT | 1,524,292 | 0 | 1,524,292 |
| **OTHER REVENUES:** | | | |
| STATE REVENUES | 45,982,338 | 0 | 45,982,338 |
| DEPARTMENTAL, OTHER AND CASH TRANSFERS | 2,451,593 | 0 | 2,451,593 |
| TOTAL OTHER REVENUES | 48,433,931 | 0 | 48,433,931 |
| TOTAL REVENUES | 49,958,223 | 0 | 49,958,223 |
| **LESS EXPENDITURES:** | | | |
| PAYROLL (GROSS) | 14,716,973 | 0 | 14,716,973 |
| VENDOR PAYMENTS AND CASH TRANSFERS | 13,517,193 | 0 | 13,517,193 |
| TOTAL EXPENDITURES | 28,234,166 | 0 | 28,234,166 |
| ENDING CASH BALANCE | 31,609,671 | 0 | 31,609,671 |

|  | JUNE 92 | ACTUAL | VARIANCE |
|---|---:|---:|---:|
| **BALANCE—BEGINNING CASH** | | | |
| CASH | | | 0 |
| INVESTMENTS | | | 0 |
| LESS: VENDOR FLOAT | | | 0 |
| PAYROLL FLOAT | | | 0 |
| NET—BEGINNING CASH | 31,609,671 | 0 | 31,609,671 |
| **ADD REVENUES:** | | | |
| PROPERTY TAX | 1,911,080 | | 1,911,080 |
| LESS: TAX INTERCEPT 21.3377%/17.3534% | 331,637 | 0 | 331,637 |

|                                         | JUNE 92    | ACTUAL | VARIANCE   |
|-----------------------------------------|-----------:|-------:|-----------:|
| NET TAX AFTER INTERCEPT                 | 1,579,442  | 0      | 1,579,442  |
| OTHER REVENUES:                         |            |        |            |
|   STATE REVENUES              | 1,591,579  |        | 1,591,579  |
|   DEPARTMENTAL, OTHER AND CASH TRANSFERS | 2,693,578 |  | 2,693,578  |
|     TOTAL OTHER REVENUES | 4,285,157 | 0  | 4,285,157  |
|     TOTAL REVENUES  | 5,864,599  | 0      | 5,864,599  |
| LESS EXPENDITURES:                      |            |        |            |
|   PAYROLL (GROSS)             | 11,409,379 |        | 11,409,379 |
|   VENDOR PAYMENTS AND CASH TRANSFERS | 13,517,193 |  | 13,517,193 |
|     TOTAL EXPENDITURES | 24,926,572 | 0  | 24,926,572 |
| ENDING CASH BALANCE                     | 12,547,699 | 0      | 12,547,699 |